UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ERIN KENESTON,

                                        Plaintiff,

                                                                    1:24-CV-0136
v.                                                                  (GTS/DJS)

NEW YORK STATE OFFICE OF THE STATE
COMPTROLLER; THOMAS P. DiNAPOLI,
New York State Comptroller; JAMIE MIZENER;
and JOAN GAGE,

                                        Defendants.

_____

APPEARANCES:                                  OF COUNSEL:

FINN LAW OFFICE                               RYAN M. FINN, ESQ.
   Counsel for Plaintiff
12 Sheridan Avenue
Albany, NY 12207

HON. LETITIA JAMES                            ELIZABETH V. LOMBARDI, ESQ.
New York State Attorney General               Assistant Attorney General
   Counsel for Defendants
300 South State Street, Suite 300             TIMOTHY P. MULVEY, ESQ.
Syracuse, NY 13202                            Assistant Attorney General

GLENN T. SUDDABY, United States District Judge

## **DECISION and ORDER**

Currently before the Court, in this employment discrimination action brought by Erin

Keneston ("Plaintiff") against the New York State Office of the State Comptroller ("OSC"), New

York State Comptroller Thomas P. DiNapoli, Jamie Mizener, and Joan Gage (collectively

"Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.

(Dkt. No. 29.)   For the reasons set forth below, Defendants' motion for summary judgment is

granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Amended Complaint

Liberally construed, Plaintiff's Amended Complaint asserts four claims: (1) a claim that Defendant DiNapoli discriminated against her in the terms and conditions of her employment on the basis of her disability in violation of the Americans with Disabilities Act ("ADA") by failing to engage in the interactive process and denying her a reasonable accommodation; (2) a claim that all Defendants discriminated against her in her terms and conditions of her employment on the basis of her disability in violation of Section 504 of the Rehabilitation Act of 1973; (3) a claim that all Defendants retaliated against her for pursuing her rights under the law in violation of Section 504 of the Rehabilitation Act of 1973; and (4) a claim that all Defendants retaliated against her for pursuing her rights under the law in violation of the New York State Human Rights Law ("NYSHRL").   (Dkt. No. 4.)

### B.    Undisputed Material Facts on Cross-Motions for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F.

Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's

statement of material facts streamlines the summary judgment analysis 'by allocating

responsibility for flagging genuine factual disputes on the participants ostensibly in the best

position to do so: the litigants themselves.'"   *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v.

Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The

Court may deem admitted any properly supported facts set forth in the Statement of Material

Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

As an initial matter, the Court finds that Plaintiff's response to Defendants' Statement of

Material Facts does not wholly comply with the requirements of the Local Rules.   Specifically,

Plaintiff has combined her supporting declaration with a Local Rule 56.1(b) response, thereby

simultaneously attempting to offer specific evidence while denying various assertions of fact

made by Defendants.   (Dkt. No. 34, Attach. 1, at 3-10.)   Such a dual-purpose Local Rule

56.1(b) response is entirely improper.[1]

---

[1]      *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 432 (N.D.N.Y. 2009) ("[Plaintiff's] . . . 40-
page, 139-paragraph, single-spaced, handwritten document that attempted to serve as the
following four things at the same time: (1) a partial Rule 7.1 Response (and counter-statement of
facts); (2) a Rule 7.1 Statement of Material Facts (in support of Plaintiff's cross-motion for
summary judgment); (3) a declaration; and (4) a document containing legal arguments (including
ad hominem attacks on defense counsel). . . . Such a document is in flagrant violation of
numerous local rules. As a result, the document in question was, and is, properly disregarded by
the Court."); *Zimmerman v. Burge*, 06-CV-0176, 2008 WL 850677, at *14 n.64 (N.D.N.Y. Mar.
28, 2008) ("I note that Plaintiff's attachment of a (self-serving) affirmation at the end of his Rule
7.1 Statement, pursuant to 28 U.S.C. § 1746, is not sufficient to transform the factual assertions
therein into factual assertions supported by record citations, as required by Local Rule 7.1. . . .
As an initial matter, Local Rule 7.1 implicitly makes a distinction between a Statement of
Material Facts and the record. . . . Moreover, such a verification cannot serve as admissible
evidence in the event of trial because it fails to demonstrate how the affiant is competent to
testify to the facts he or she alleges . . . . Finally, such a verification cannot transform several of
Plaintiff's factual assertions into evidence since they are devoid of necessary specifics.")
(internal quotation marks and citations omitted).

Granted, Plaintiff has also submitted a *separate* Local Rule 56.1(b) response.   (Dkt. No. 34, Attach. 2.)   However, this response appears to be nothing more than a copy of the relevant content of her improper declaration-response, and indeed acknowledges at its beginning that "Plaintiff as and for her response to the Statement of Material Facts claimed by defendants refer to the Keneston Declaration, which provides a paragraph by paragraph response starting at Section E, Paragraph 14 which states (in the first person and citing to that particular Section E as Record proof) . . . .   (*Compare* Dkt. No. 34, Attach. 2 *with* Dkt. No. 34, Attach. 1, at 3-10.)   As a result, this separate response (which the Court will liberally construe as her *intended* Local Rule 56.1[b] response) lacks any of the "specific" citations to her declaration that are demanded by Local Rule 56.1(b).   *See* N.D.N.Y. L.R. 56.1(b) ("Each denial shall set forth a *specific* citation to the record where the factual issue arises.") (emphasis added).[2]   The Court declines to

---

[2]   *See Robert H. Law, Inc. v. Woodbine Bus. Park, Inc.*, 13-CV-1393, 2018 WL 851382, at *5 (N.D.N.Y. Feb. 12, 2018) ("[T]he Court does not accept this as an undisputed fact [because] . . . Defendant cited generally to the entire affidavit of Derek Tarolli rather than to a specific portion of that affidavit where its assertion is supported . . . ."); *Alex v. Gen. Elec. Co.*, 149 F. Supp. 3d 253, 280 (N.D.N.Y. 2016) ("[T]he Court draws the line at Plaintiff's practice, in her Rule 7.1 Response, of routinely citing a section of her deposition transcript spanning 196 pages, and often adding references to one or more deposition transcripts in their entirety."); *Rizzo v. Health Research, Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Clark v. N.Y.S. Office of the State Comptroller*, 09-CV-0716, 2014 WL 823289, at *1, n. 8 (N.D.N.Y. Mar. 3, 2014) ("While Clark responded, . . . she did not do so in compliance with Local Rule 7.1(a)(3). For instance, many of Clark's denials do not, as Rule 7.1 requires, set forth a specific citation to the record where the factual issue arises, but instead accompany an instruction to 'see record evidence' or 'see total record evidence,' contain no citation whatsoever, or generally cite an entire document–often, an entire deposition transcript."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at *1 n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Wang v. Swain*, 09-CV-0306, 2011 WL 887815, at *1 (N.D.N.Y. Mar. 14, 2011) ("[A] simple citation to an 'exhibit' consisting of numerous documents, or citation to a deposition without a pinpoint citation to where in the deposition support for the denial is contained, is insufficient."); *Bronner v. Catholic Charities of Roman*

conduct a *sua sponte* review of this 11-page, single-spaced declaration.   However, of course, the Court will not turn a blind eye to any contradictory evidence that it comes across during its ordinary review of the record (e.g., to determine if Defendants have met their threshold burden).

The Court also observes that Plaintiff's intended Rule 56.1(b) response often cites, as support for its various denials, Plaintiff's unverified Amended Complaint.   (Dkt. No. 34, Attach. 2, at ¶¶ 5, 10, 11, 14, 28, 51.)   Of course, an unverified complaint may not be relied on by a plaintiff as admissible record evidence when opposing a defendant's motion for summary judgment.   *See Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) ("[The non-moving party on a motion for summary judgment] cannot defeat the motion by relying on the allegations in [its] pleading . . . .").   However, a closer question is presented by Plaintiff's attempt, in her opposition to Defendants' motion, to retroactively transform the factual allegations of her unverified complaint into sworn assertions.   (Dkt. No. 34, Attach. 1, at 1, 11 ["Pursuant to 28 U.S.C. § 1746, Erin Keneston being duly sworn, deposes and says: . . . I have reviewed the

---

*Catholic Diocese of Syracuse, Inc.*, 08-CV-0015, 2010 WL 981959, at *1 (N.D.N.Y. Mar. 15, 2010) ("Plaintiff simply cites to the documents generally, i.e., a simple cite to the exhibit number, and in many instances, cites to numerous exhibits to support a single proposition. Apparently, Plaintiff or his attorneys expect the Court to wade through the mass of paper to find whether or not the 'cite' supports a proposition made by Plaintiff . . . ."); *Janneh v. Regal Entm't*, 07-CV-0079, 2009 WL 2922830, at *1 n.3 (N.D.N.Y. Sept. 8, 2009) ("In response . . . Janneh filed a 'Statement of Material Facts Not in Dispute.' . . . The document consists of . . . a phrase at the end of the document stating simply: 'See Attached Exhibits.' Janneh's statement fails to comply with the Local Rules which Janneh has repeatedly been advised about . . . ."); *Mercer v. Brunt*, 299 F. Supp. 2d 21, 23 n.1 (D. Conn. 2004) ("The parties' failure to appropriately cite to the record has made the Court's duty that much more difficult. When a party cites to a transcript, not only must the page be cited, but also the lines relied upon. Counsel and pro se parties are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule [Loc. R. Civ. P. 56] may result in sanctions . . . .") (internal quotation marks omitted); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at *2 n.6 (S.D.N.Y. Oct. 17, 2000) ("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts. . . . [A] vague cite to all of the exhibits is simply unacceptable.").

Amended Complaint, and can confirm that the factual allegations asserted in that Complaint are accurate and true based upon my personal knowledge. . . .    I declare under penalty of perjury that the foregoing is true and correct"].)    Under the circumstances, the Court will consider this attempted transformation successful.    *Cf. Gupta v. Green*, 109 F. App'x 992, 993 (9th Cir. 2004) ("Gupta's declaration under penalty of perjury merely swore that he did indeed incorporate the statement of facts in his amended complaint, not that the statements in that unverified complaint were true.").

Applying the relevant legal standard here, the following facts have been asserted and supported by record citations by Defendants, and either expressly admitted or denied without a supporting record citation by Plaintiff.

1.       Plaintiff is currently employed as a Grade-12 Employees' Retirement System Examiner 2 ("ERSE 2") at the Office of the State Comptroller ("OSC").

2.       Plaintiff, in her position as an ERSE 2, currently directly reports to her immediate supervisor, Defendant Mizener.

3.       In 2023, Plaintiff was also employed as a Grade-12 ERSE 2 at the OSC.

4.       In 2023, in her position as an ERSE 2, Plaintiff directly reported to her immediate supervisor, Defendant Mizener.

5.       An ERSE 2 processes the full range of determinations and customer inquiries in the Customer Contact Center and processes requests for service credit modifications and benefit payments for the New York State and Local Retirement System.[3]

---

[3]       Plaintiff expressly admits only "part" of this asserted fact, but does not specify which part of it she implicitly denies, does not cite any admissible record evidence in support of a partial denial, and instead adds facts that do not directly address what is asserted in the presented fact. (Dkt. No. 34, Attach. 2, at ¶ 4.)    Because Plaintiff has not cited any evidence to support a denial

6. Additionally, although Plaintiff denies being a supervisor, an ERSE 2 provides technical supervision to ERSE 1s and office assistants, which includes reviewing calculations and work completed by staff to ensure compliance with all policies, regulations, and laws.[4]

---

and because the purpose of a response is not to add facts, this asserted fact is deemed admitted. *See N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *Nanos v. City of Stamford*, 609 F. Supp. 2d 260, 263 (D. Conn. 2009) ("With regard to Nanos's responses to Paragraphs 8, 13, 15, 17, 19, 20, and 26 of the City's Local Rule 56(a)1 Statement, the Court finds that Nanos does not actually deny the City's factual allegations, but simply adds commentary or analysis not related to the existence or non-existence of the facts alleged by the City. Such commentary or analysis is not appropriate when responding to a Local Rule Statement, and is best left to the discussion in Nanos's memorandum of law. Therefore, the Court deems admitted [these] Paragraphs . . . of the City's Local Rule 56(a)1 Statement.").

[4] Plaintiff denies this asserted fact, and states that she is "not a supervisor and did not have supervisory authority over ERSE 1s or office assistants." (Dkt. No. 34, Attach. 2, at ¶ 5.) In support of this denial, Plaintiff cites a paragraph of her Amended Complaint and a portion of a deposition transcript. (*Id.*) However, the cited paragraph of Plaintiff's Amended Complaint (even when treated as verified) merely states, "Plaintiff is not a supervisor." (Dkt. No. 4, at ¶ 9.) Neither Plaintiff's Amended Complaint nor her Local Rule 56.1(b) response denies Defendants' factual assertion that an ERSE 2's duties "include[] reviewing calculations and work completed by staff to ensure compliance with all policies, rules, regulations, and laws." (Dkt. No. 4, at ¶ 9; Dkt. No. 34, Attach. 1, at 3 ¶ 5.) In fact, Plaintiff expressly acknowledges that an ERSE 2 does provide at least some "occasional peer assistance or quality checks . . . ." (Dkt. No. 34, Attach. 1, at 3 ¶ 5.) Moreover, the portion of the deposition transcript cited by Plaintiff (i.e., pages 7 through 9 of Defendant Jamie Mizener's deposition transcript) does not controvert the fact asserted by Defendants. (Dkt. No. 29, Attach. 6, at 7-9 [Ex. B to Lombardi Decl.].) Indeed, the fact asserted by Defendants is clearly supported by the evidence presented by them, including a Tentative Classification Standard expressly stating that the "illustrative duties" of an ERSE 2 include "function[ing] as a technical supervisor of Office Assistances and ERSE 1s" and "review[ing] calculations and work completed by staff and ensure compliance with all relevant policies, rules, regulations, and laws." (Dkt. No. 29, Attach. 65, at 11.) Another document (an Office of State Comptroller Duties Statement) defines a "functional" supervisor as one who "reviews and approves the work of staff performing a specific activity, but not their overall work behavior and assignments." (*Id.* at 15.) For all of these reasons, Plaintiff's general assertion

7

**<u>Plaintiff's Reasonable Accommodation Request</u>**

7.      As of January 2021, Plaintiff had a diagnosis of unspecified anxiety disorder from her primary care provider, Dr. Lettrick.

8.      In July 2021, OSC's Division of Diversity Management received a reasonable accommodation request from Plaintiff to telecommute four days per week as needed to control her general anxiety disorder and panic attacks.

9.      In a letter dated August 11, 2021, Dr. Lettrick stated that the Plaintiff has been diagnosed with anxiety and panic attacks.   Her triggers were noted as "social situations and crowded places," and it was noted that "[s]he manages them with medication, removing herself from the situation or avoiding the said situation."   Dr. Lettrick additionally noted that "[s]he had been treated for these conditions for over 5 years."

10.      In September 2021, the Division of Diversity Management sent a Reasonable Accommodation Determination to Plaintiff, offering an alternative accommodation to move Plaintiff to a vacant cubicle distanced from other staff members, and indicating that stackers were being placed in the cubicles in Plaintiff's area the following month to provide additional privacy.[5]

---

that she is "not a supervisor" is insufficient to create a genuine dispute of material fact as to this specific factual assertion.

[5]      Plaintiff expressly admits "DDM issued such a determination about cubicle placement" but then, instead of expressly denying any portion of Defendants' asserted fact, she improperly attempts to add facts regarding her "condition's triggers" (which were never mentioned in the asserted fact).   In any event, in support of this added fact, Plaintiff cites only a paragraph of her Amended Complaint that does not actually support the added fact.   (*Compare* Dkt. No. 34, Attach. 2, at ¶ 10 *with* Dkt. No. 4, at ¶ 15.)   The Court notes that, despite the fact that she admitted in this response that the accommodation to relocate her cubicle occurred in response to her 2021 request for accommodation, she testified at her deposition that this accommodation occurred in response to her later 2023 request.   (Dkt. No. 29, Attach. 4, at 133.)   Not only is

11.     Plaintiff was also notified that, in addition to the reasonable accommodation involving the location of her cubicle, the Determination stated that "you may request your management's approval to participate in the agency's telecommuting program that allows employees to work from home up to four days per pay period."[6]

12.     In November 2022, Dr. Lettrick stated that Plaintiff's "[a]nxiety is under control on sertraline, depression is in remission, will continue sertraline 100mg daily.   Will try to get a reasonable accommodation for patient to allow her to work from home."

13.     Beginning prior to 2023, the Office of the State Comptroller required employees to fulfill at least 50% of their non-field duties at their work location.[7]

14.     Plaintiff submitted another reasonable accommodation request to the Division of Diversity Management on January 12, 2023, seeking the "flexibility to work from home full time as needed."

---

this deposition testimony directly contracted by her Local Rule 56.1(b) response, it is also directly contradicted by the Reasonable Accommodation Determination letter dated September 2, 2021, in which it is noted that "DDM met with your management team and agreed to move your workstation to a vacant cubicle distanced from other staff members," as well as that "stackers are being placed on the cubicles in your area by early October 2021," which will "provide additional privacy and protective shielding."   (Dkt. No. 29, Attach. 11, at 1.)   Under the circumstances, the Court finds that Plaintiff has effectively admitted the entirety of this asserted fact.

[6]     This asserted fact is deemed admitted in its entirety because, again, Plaintiff has not expressly denied any portion of the asserted fact, but rather merely attempts to assert additional facts.   *See, supra,* Notes 3 and 5 of this Decision and Order.

[7]     Plaintiff expressly denies only that in-office presence of at least 50% was constituted "an essential function" of her position.   (Dkt. No. 34, Attach. 2, at ¶ 13.)   The Court agrees with this partial denial to the extent that the evidence cited by Defendants does not establish that this telecommute policy was considered an "essential function" of any position, merely that it is what was the telecommute policy at the time.   For these reasons, the Court has omitted the relevant language regarding in-office presence of at least 50% as being an essential function of Plaintiff's position, and deemed the remainder of the asserted fact admitted.

15.     This request letter included notes from Dr. Lettrick dated January 13, 2023, which stated that it was Dr. Lettrick's opinion that Plaintiff 'should be given an accommodation at work to allow her to work 100% from home.   She is more productive and reliable when working from home, and this would significantly reduce her risk for serious illness due to her condition."

16.     Dr. Lettrick also stated in this documentation that Plaintiff has a long history of anxiety with panic attacks, and "[h]er symptoms are significantly affected by going to work in person for the Office of the State Comptroller.   She gets anxious just getting ready to drive to work, her symptoms accelerate on her drive to work and continue throughout the workday, despite the offices [sic] effort to give her privacy while at work."

17.     The Division of Diversity Management was responsible for OSC's reasonable accommodation process in 2023.

18.     On January 19, 2023, Thomas Green, an Equal Opportunity Specialist 1 with the Division of Diversity Management, sent a fax to Dr. Lettrick's office posing additional questions about how Plaintiff's medical condition affects her in the office as opposed to working from home.

19.     Those additional questions requested further information from Dr. Lettrick regarding Plaintiff's disability and in-office triggers.

20.     That same day, Mr. Green called Plaintiff on her cell phone and informed her of the additional questions being sent to her medical provider.

21.     During that phone call, Plaintiff stated that she would follow up with Dr. Lettrick and requested a copy of the additional questions.

22.     Mr. Green emailed Plaintiff a copy of those additional questions.

23.     Lettrick Family Medicine, PLLC sent a fax to the Division of Diversity Management

on January 24, 2023, resubmitting the same medical documentation dated January 13, 2023.

24.     None of the additional questions faxed by the Division of Diversity Management were answered with this fax.

25.     On January 26, 2023, Mr. Green and Deputy Comptroller for the Division of Diversity Management Nancy Hernandez decided that they needed to determine the duration of both Plaintiff's medical condition and the recommended accommodation.[8]

26.     On the same date, Mr. Green also had a conversation with Defendant Mizener and Kim Zeto, the Director for the Bureau where Plaintiff worked.[9]

27.     During the conversation with Defendant Mizener and Ms. Zeto, Defendant Mizener confirmed that Plaintiff's cubicle was in an aisle with only one other person, and that other

---

[8]     Plaintiff expressly admits an unspecified "part" of this asserted fact and then, instead of expressly denying any portion of the asserted fact, she disclaims personal knowledge of DDM's internal deliberations and improperly attempts to add facts.   (Dkt. No. 32, Attach. 2, at ¶ 25.) *See also, supra,* Note 3 of this Decision and Order.   In any event, she provides no citation to admissible record evidence in support of those improperly added facts.   (*Id.*)   As a result, this fact is deemed admitted in its entirety.   The Court adds only that a lack of knowledge is, of course, not a basis for a denial.   *See Cornell Univ. v. Tompkins-Cortland Counties Building Trades Council, Maintenance Div.,* 775 F. Supp. 3d 640, 643 n.2 (N.D.N.Y. 2025) (Hurd, J.) ("[I]t is insufficient to deny a properly supported fact due to a 'lack of knowledge.'") (citing *Disability Rights N.Y. v. N.Y. State Dept. of Corrs. & Cmty. Supervision*, 20-CV-1487, 2024 WL 184248, at *4 n.3 [N.D.N.Y. Jan 16. 2024] [Suddaby, J.]); *Percoco v. Lowe's Home Ctrs., LLC*, 208 F. Supp. 3d 437, 440 n.2 (D. Conn. 2016) ("Plaintiff, at various points, fails to admit or deny facts and instead states that she has 'no knowledge.' . . . The Court deems those facts admitted because 'no knowledge' is a noncognizable response."); *In re Horowitz*, No. 14-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact . . . ."); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute.").

[9]     This asserted fact is deemed admitted for the reasons discussed above in Note 3 of this Decision and Order.

employees were several feet away from Plaintiff.[10]

28.    When asked about Plaintiff's essential job functions, Ms. Zino and Defendant Mizener stated that, although Plaintiff is not a supervisor, she may serve as a "technical supervisor" and look over the work of lower-level clerical staff and serve as a mentor to other staff, and that this should be done in-office.   They also advised that there could be other instances where Plaintiff may be needed in-office for a special project or training.[11]

29.    On January 27, 2023, Mr. Green called Lettrick Family Medicine, PLLC and left his contact information with their receptionist.

30.    On January 30, 2023, Mr. Green spoke with Dr. Lettrick by telephone.

31.    Dr. Lettrick opined that Plaintiff's medical condition is lifelong, and that the disability-related limitation in her workplace is that she faces "stimuli" in the office, including "people causing commotions" or "being loud" which are not present when Plaintiff is at home.

32.    Dr. Lettrick also stated during this conversation that exposure to COVID-19 could exacerbate Plaintiff's medical condition.

33.    Further, Dr. Lettrick stated that Plaintiff has difficulty driving to work because the

---

[10]    This asserted fact is deemed admitted for the reasons discussed in Note 3.

[11]    Plaintiff denies the asserted fact, stating that she is "not a supervisor" and did "not have ongoing 'technical supervision' responsibilities that would require in-person presence.   Any occasional mentoring or quality checks, when requested, have been handled via Teams and electronic systems."   (Dkt. No. 34, Attach. 2, at ¶ 28.)   As a threshold matter, the asserted fact specifically regards only what Defendant Mizener and Ms. Zino *told* Mr. Green regarding Plaintiff's job duties, and nothing in Plaintiff's response or cited evidence contradicts that asserted fact.   In any event, Plaintiff's denial (which disavows "ongoing" supervisory duties and acknowledges "occasional" such duties) is not supported by the record evidence she cites, because that evidence does not indicate that there would *never* be a time when her technical supervisory (or other) duties would need to be performed in-office.   This asserted fact is therefore deemed admitted.

idea of going "into the world" or a crowded place exacerbates her condition.

34.      Finally, when Mr. Green asked Dr. Lettrick if there were any alternatives, he stated that giving Plaintiff a private office could serve as an alternative in-office accommodation.[12]

35.      On February 1, 2023, Mr. Green had a meeting with Defendant Mizener and Michelle Correll (who was at that time the Personnel Liaison for the Division of Retirement Services) where they discussed the possibility of doing a 60% telecommuting schedule for Plaintiff with the days being spread apart so that Plaintiff would not be doing back-to-back days in the office because she had previously indicated having particular difficulty coming into the office on back-to-back days.

36.      During that meeting, Defendant Mizener stated that a different schedule would be difficult as there would be different supervisors in-office when Plaintiff was in the office during a 60% schedule.[13]

37.      On February 2, 2023, Mr. Green, Ms. Hernandez, Defendant Mizener, Ms. Correll, Ms. Zeto, and Defendant Gage had a meeting and again discussed the possibility of Plaintiff working a 60% telecommuting schedule with the days being spread apart so that Plaintiff was not working back-to-back days in the office.[14]

38.      At this meeting, Plaintiff's managers again discussed concerns about Plaintiff working without direct supervision.[15]

---

[12]      This asserted fact is deemed admitted for the reasons discussed in Note 8.

[13]      Plaintiff denies personal knowledge of this asserted fact, which (again) is insufficient to support a denial.   *See, supra,* Note 8 of this Decision and Order.

[14]      This asserted fact is deemed admitted for the reasons discussed in Note 8.

[15]      Plaintiff denies this asserted fact, stating that her supervisors "did not have concerns

39.     On February 3, 2023, Ms. Hernandez and Mr. Green met with Plaintiff to discuss management's position regarding the essential functions of her job.

40.     During this meeting, Plaintiff claimed that she did not train or mentor anyone, and that her work was tracked so there should not be an issue with her working without direct supervision.

41.     Ms. Hernandez asked Plaintiff about the 60% telecommuting proposal.

42.     Plaintiff stated that a 60% telecommuting schedule where she worked remotely every other day could work.[16]

43.     Plaintiff verbally agreed to the 60% telecommuting schedule as a reasonable accommodation.[17]

─────────────

about [her] working without direct in-person supervision."   (Dkt. No. 34, Attach. 2, at ¶ 38.) This asserted fact is deemed admitted for reasons similar to those stated above in Note 11 of this Decision and Order.   As a threshold matter, the asserted fact specifically regards only the concerns that were discussed at a meeting by Plaintiff's managers (who included individuals in addition to specifically Jamie Mizener); and nothing in Plaintiff's response or cited evidence contradicts that asserted fact.   Rather, Plaintiff's cited evidence (two pages of the transcript of the deposition of Defendant Mizener) merely indicates that, independent of what concerns may have been discussed at the meeting, *Defendant Mizener* did not "have a problem with her working full-time from home."   (Dkt. No. 29, Attach. 6, at 11.)   This fact is therefore deemed admitted.

[16]     This asserted fact is deemed admitted for the reasons discussed in Notes 3 and 8.

[17]     Plaintiff denies the asserted fact "as characterized" then, without explaining what parts of the asserted fact she is denying or admitting, improperly attempts to add facts regarding *why* she agreed or whether the accommodation was "sufficient" or "final." (Dkt. No. 34, Attach. 2, at ¶ 43 [adding that she "temporarily agreed to try the 60% schedule so [she] could continue working and avoid exacerbating [her] condition; [she] did not agree that 60% was a sufficient or final accommodation. [Her] request for 100% telework remained pending, with my commitment to appear in person as necessary"].)   However, the asserted fact expressly says nothing about *why* she agreed or whether the accommodation was "sufficient" or "final"; and a Local Rule 56.1(b) response is not a place to deny implications of fact.   *See, supra,* Note 3 of this Decision and Order.   Furthermore, her denial lacks a supporting citation to admissible record evidence.   To the contrary, Defendants' assertion is supported by Plaintiff's own deposition transcript.   (Dkt.

44.    After that meeting, Ms. Hernandez and Mr. Green met with Ms. Zeto so that Plaintiff's managers knew Plaintiff's position regarding the proposed accommodation.

45.    Ms. Zeto advised that she would speak with Defendant Mizener and Defendant Gage the next business day to make sure the 60% telecommuting schedule worked for them.

46.    On February 7, 2023, Ms. Zeto responded to an email from Mr. Green stating that management was agreeable to the proposal of Plaintiff telecommuting 60% pursuant to the previously discussed schedule.

47.    On February 10, 2023, a reasonable accommodation memorandum was sent to Plaintiff granting a 60% telecommuting schedule until May 10, 2023.

48.    The telecommuting schedule as described in this memorandum was that Plaintiff would telecommute on Mondays, Wednesdays, and Fridays, and she was required to be in the office on Tuesdays and Thursdays.

49.    Plaintiff began working this schedule immediately.

50.    Three times during her deposition, Plaintiff referred to the process in which she engaged with OSC as "interactive."[18]

51.    On February 16, 2023, Plaintiff filed a disability discrimination complaint with the New York State Division of Human Rights ("NYSDHR").

52.    On March 30, 2023, NYSDHR served a letter along with Plaintiff's discrimination

---

No. 29, Attach. 4, at 150; Dkt. No. 29, Attach. 5, at 1.)   For these reasons, the Court finds that Plaintiff's denial is not properly supported and therefore deems the asserted fact to be admitted.

[18]    (Dkt. No. 29, Attach. 2, at ¶ 51 [citing Dkt. No. 29, Attach. 4, at 133, 147-48, 165-66] with Dkt. No. 34, Attach. 2, at ¶ 51 [denying the fact only "as characterized," and in any event citing only Paragraphs 20-22 and 47-48 of the Amended Complaint, which do not controvert the above-stated fact].)

complaint on Defendant OSC.

53.     This letter was date-stamped as received by Defendant OSC's mailroom on April 3, 2023.

54.     Pursuant to NYSDHR's own records, it first notified Defendant OSC of Plaintiff's discrimination complaint when it mailed the letter and complaint on March 30, 2023.

55.     On April 26, 2023, legal counsel for Defendant OSC filed a letter with NYSDHR responding to Plaintiff's discrimination complaint.

56.     On May 5, 2023, Dr. Lettrick wrote an addendum in Plaintiff's medical records that stated that her "condition restricts her ability to drive to work and causes her to be anxious and distracted at work due to close proximity to other coworkers.   She does not tolerate close exposure to others, as well as noise and commotion around her workstation.   She would have difficulty driving to work, and would be able to work in the office if she had a private office with a door, and was able to work with minimal distractions.   Short of that, I would recommend she work from home 100% of the time."

57.     NYSDHR drafted a Final Investigation Report and Basis for Determination dated September 22, 2023, which was received by Defendant OSC pursuant to a FOIL request for Plaintiff's case file.

58.     In a Determination and Order After Investigation dated September 27, 2023, NYSDHR dismissed Plaintiff's discrimination complaint on a finding of "No Probable Cause."

<strong><u>Plaintiff's Time Theft and Resulting Investigation</u></strong>

59.     On or shortly before February 14, 2023, Defendant Gage and Defendant Mizener discovered that Plaintiff had submitted more than 20 hours of overtime for the most recent week.

60.     On February 14, 2023, Defendant Gage and Defendant Mizener met with Plaintiff to

remind her that she could work only 20 hours of paid overtime per week.

61.    On or shortly before February 23, 2023, Defendant Mizener discovered that Plaintiff

had recorded having worked overtime for several hours on February 18, 2023, until 7:30 p.m.,

even though the system Plaintiff used to conduct work was down for a period of several hours

beginning at 6:00.p.m.[19]

62.    Defendant Mizener reported this to Defendant Gage on or about the same day.

63.    On or shortly before February 23, 2023, there was a Teams call between Labor

Relations Representative Gillian Gersen and Defendant Gage about another employee having

been caught stealing time, and Defendant Gage mentioned that Plaintiff appeared to have stolen

time as well.

64.    Defendant Gage explained to Ms. Gersen what Defendant Mizener had reported and

indicated to Ms. Gersen that there were longstanding concerns about Plaintiff potentially stealing

time.[20]

65.    Defendant Gage asked Ms. Gersen if Defendant Mizener should begin gathering data

---

[19]    Although Plaintiff purports to deny this fact, nothing in her response contradicts the assertion that she (a) recorded overtime after 6:00 p.m. on the relevant date, or that (b) subsequently Defendant Mizener discovered that the system was down after 6:00.p.m. that day (regardless of whether Plaintiff worked on a case after that time and emailed Mizener the case number so that he could see the time that it was closed).  (Dkt. No. 34, Attach 2, at ¶ 62.)  To the contrary, Plaintiff's response appears to acknowledge that the system went down that day. (*Id.* ["Normally when the system goes down, it kicks you out of it."].)  Moreover, Plaintiff expressly acknowledges that she emailed Defendant Mizener that she "would change the time to 6:00."  (*Id.* ["I emailed Jamie that I would change the time to 6:00."].)  As a result, this asserted fact is deemed admitted for the reasons discussed in Notes 3 and 8.

[20]    This asserted fact is deemed admitted for the reasons discussed in Note 3.  The Court adds that Plaintiff's per-case production rate and absence of negative reviews have little, if any, bearing on what Joan Gage told Gillian Gersen on or shortly before February 23, 2023, about the above-stated longstanding concerns.

about this, and Ms. Gersen stated not to do anything because she wanted to speak with her supervisor.

66.     On February 23, 2023, Defendant Gage received an email from Ms. Gersen that she had spoken with her supervisor and that they should take no further action until Plaintiff submitted the timesheet at issue.

67.     Defendant Gage emailed Ms. Gersen that same date stating that Plaintiff had submitted her telecommuting event for February 18, 2023, and that Plaintiff had represented that she telecommuted until 7:30 p.m.

68.     On or about March 2, 2023, Plaintiff submitted her timesheet that included her having worked 1.5 hours of overtime between 6:00.p.m. and 7:30.p.m. on February 18, 2023.

69.     Defendant Mizener returned the timesheet to Plaintiff shortly after and asked her to change her hours worked to end at 6:00 p.m. because the system was down and she could not have worked overtime beyond then.

70.     Plaintiff updated the timesheet to reflect that she stopped working at 6:00.p.m., and resubmitted the corrected timesheet to Defendant Mizener, who approved it.[21]

71.     On March 14, 2023, Defendant Gage emailed Ms. Gersen stating that Plaintiff submitted her timesheet incorrectly by claiming to have worked times when she did not work, that Defendant Mizener returned the timesheet to Plaintiff and asked her to change the end time to 6:00 p.m., and that Plaintiff did this.

---

[21]     Plaintiff denies this asserted fact, but attempts to support that denial only with the words "See 62." (Dkt. No. 34, Attach. 2, at ¶ 71.)   However, nothing in Paragraph 62 of Plaintiff's Local Rule 56.1(b) response controverts this asserted fact.   (*Id*. at ¶ 62.)   To the contrary, in Paragraph 62, Plaintiff expressly states, "I emailed Jamie that I would change the time to 6:00." (*Id*.)   As a result, this asserted fact is deemed admitted for the reasons discussed in Notes 3 and 19.

72.     After this, Defendant Gage spoke with Defendant Mizener and, consistent with the guidance from Ms. Gersen, asked him to review Plaintiff's production report and timesheet for the period for January 29, 2023, through February 4, 2023.

73.     On or shortly before March 27, 2023, Defendant Mizener provided Defendant Gage with his review of this information, which showed perceived discrepancies between Plaintiff's production and time worked.[22]

74.     On March 27, 2023, Defendant Gage emailed Ms. Gersen the information compiled by Defendant Mizener.

75.     Attached to the March 27, 2023, email from Defendant Gage was a summary from Defendant Mizener stating that this situation began when Plaintiff worked more than the allowed 20 hours of overtime in one week, and, soon after, Plaintiff entered that she worked until 7:30 p.m. on February 18, 2023, when the system went down at 6:00 p.m.[23]

76.     On April 4, 2023, Director of Human Resources Randy Hotaling was forwarded an email from Plaintiff.

77.     This forwarded email was an email from Defendant Mizener to Plaintiff, in which it

---

[22]     Plaintiff denies this asserted fact, again attempting to improperly add explanatory facts. Nothing in Plaintiff's explanation controverts the fact asserted, which regards the review provided by Defendant Mizener to Defendant Gage on or shortly before March 27, 2023.   As a result, this asserted fact is deemed admitted for the reasons discussed in Note 3.   However, accounting for the fact that the cited evidence shows that some of the time originally identified as creating a discrepancy was later found to be valid, the Court has added the word "perceived" to the asserted fact.

[23]     This fact is deemed admitted for the reasons discussed in Notes 3 and 19 of this Decision and Order.   Plaintiff does not deny or dispute that (a) this is what the relevant email conveyed, or (b) that this sequence of events happened, whether or not she disagrees with the assertion that (at least for her personally) the system was actually down after 6:00 p.m. on the relevant day. (Dkt. No. 34, Attach. 2, at ¶ 76.)

was stated that, effective immediately, Plaintiff was no longer approved to work overtime, as well as that Defendant OSC had reason to believe that there were inaccuracies in Plaintiff's production reports and timesheets.

78.    In the forwarded email, Plaintiff stated that she was formally appealing the withdrawal of approval to work overtime, and that she could explain any inaccuracies if she was told what they were.

79.    On April 13, 2023, Plaintiff sent Mr. Hotaling another email following up from her previous email.

80.    Mr. Hotaling replied to Plaintiff's email on April 14, 2023, and stated that "[c]onsistent with OSC policy on the authorization and distribution of overtime, management retains the right to determine whether an employee is qualified and eligible to work overtime, and the right to determine whether to authorize overtime work.   OSC policy does not provide for an appeal of this decision."

81.    Plaintiff contacted NYSDHR by telephone on April 18, 2023, and stated that she was being retaliated against because she was told on April 4, 2023, that she was no longer allowed to work overtime due to a discrepancy on her timesheet.

82.    Plaintiff told NYSDHR that the retaliation was specifically because she filed a complaint with the NYSDHR.

83.    On April 18, 2023, Plaintiff was advised by NYSDHR that they would email her a complaint form.

84.    On April 18, 2023, Plaintiff was sent an email with a new complaint form by NYSDHR for her retaliation complaint.   Specifically, NYSDHR stated in that email to Plaintiff, "[i]f you would like to file a retaliation complaint, please see the attached form and fill it out to

reflect retaliation.   Once we receive a filled out retaliation complaint, we will process the complaint and investigate that matter separately from your current case."[24]

85.     Plaintiff did not file a NYSDHR complaint with regard to the alleged retaliation by Defendant OSC.

86.     On April 26, 2023, Ms. Gersen interrogated Plaintiff pursuant to the Collective Bargaining Agreement governing Plaintiff's employment.

87.     The same day, Plaintiff was notified that she was being placed on administrative leave with pay, until further notice, pending an investigation.

88.     Labor Relations continued to investigate Plaintiff and interrogated her again on June 5, 2023.

89.     That same day, Plaintiff received a notice of suspension without pay.

90.     On June 16, 2023, Plaintiff received a Notice of Discipline with a Statement of Charges against her.

91.     The sixteen charges against Plaintiff included the following: four charges of submitting fraudulent timesheets; two charges of insubordination; one charge for receiving compensation for approximately 60 hours ($2000), including 23 hours of overtime for which she did not work, during the three-month period from January to April 2023; one charge of knowingly submitting false time records in violation of N.Y. Pen. L. § 175.35(1); six charges of submitting a fraudulent production report; one charge for violating the Office of the State Comptroller's Employee Handbook; and one charge for violating Article 10.10(b) of the

---

[24]     This asserted fact is deemed admitted for the reasons discussed in Note 3.

State/CSEA Agreement.[25]

92.    Labor Relations proposed terminating Plaintiff due to the breadth of her misconduct in stealing over 60 hours of time in a three-month period and after considering her prior discipline.

93.    Labor Relations then compiled a document comprised of more than 500 pages titled "Expedited Resolution for Erin Keneston" to support her discipline.

94.    In response, Plaintiff and her union representative commenced a settlement negotiation with Defendant OSC over her suspension and Notice of Discipline.

95.    Plaintiff voluntarily settled this discipline matter on August 3, 2023, and entered into a Settlement and Last Chance Agreement.

96.    As part of this Agreement, Plaintiff voluntarily agreed to an eight-week unpaid suspension, a last chance to stay employed at the OSC with immediate termination if she engaged in similar behavior over the next year, and a prohibition on overtime and telecommuting.

97.    Plaintiff entered into this settlement while being fully represented by her union and with the ability to instead go to disciplinary arbitration to prove her innocence.[26]

98.    On August 4, 2025, Ms. Gersen sent a letter to Plaintiff notifying her that she could return to work on August 7, 2023.

99.    The investigation, Plaintiff's suspension, and the penalty sought against Plaintiff were consistent with other disciplinary matters that Ms. Gersen, or other members of Labor Relations,

---

[25]    This asserted fact is deemed admitted for the reasons discussed in Note 3.

[26]    This asserted fact is deemed admitted for the reasons discussed in Note 3.

have handled.[27]

100.    Labor Relations investigates time and attendance, telecommuting, and other violations by employees of the OSC across the agency.

101.    In 2023, Labor Relations opened eight other investigations into employees in the Retirement Services unit.

102.    Four of these investigations focused on time and attendance, three on submission of a false instrument, and one on insubordination.

103.    In a similar case in 2023, a Retirement Services employee who was found to have falsified overtime was interrogated and promptly resigned.[28]

104.    The prior year, a Retirement Services employee was found to have falsified production reports by taking credit for other staff's work.   Their telecommuting privileges were revoked, they were investigated and interrogated, and they too resigned in lieu of suspension and discipline.

---

[27]    Plaintiff denies the asserted fact, stating that "[a]nother employee in another unit, Mike Olender, was counseled because he was unreachable on teams and missed teams unit meetings and he had to come in office 100 percent for 6 months. I do not even believe it was elevated to a level of an interrogation." (Dkt. No. 34, Attach. 2, at ¶ 101.)   She cites no admissible record evidence for these statements.   (*Id*.)   Even if the Court were to take notice of page 9 of Plaintiff's Declaration (in which she reasserts these statements at Paragraph 14, Subparagraph 101), she does not adduce evidence sufficient to support a finding that she has personal knowledge of the matter asserted, as required by Fed. R. Evid. 602.   In any event, she cites only to an example pertaining to an employee in a different unit from her, who was disciplined by being required to return to the office full-time for six months due to being unreachable on Microsoft Teams and missing virtual meetings, conduct which it is not clear is sufficiently similar to that with which Plaintiff was charged.   Moreover, Plaintiff's lack of knowledge as to whether that employee was interrogated cannot serve as evidence that that employee was treated more favorably than her. *See, supra,* Note 8 of this Decision and Order.

[28]    This asserted fact is deemed admitted for the reasons discussed in Note 3.

105.    The evidence contained in the Expedited Resolution supported Labor Relations' finding that Plaintiff submitted fraudulent timesheets and fraudulent production reports, committed time theft, and was insubordinate.

106.    On September 20, 2023, Dr. Lettrick wrote a note stating that Plaintiff's "anxiety is getting worse, mostly due to work.   She asked for accommodation to from home 100%, was denied.   When she appealed the decision, her supervisor gave her a bad review and is now mandating that she work 100% in the office…FMLA paperwork filled out."

107.    Plaintiff did not request a reasonable accommodation or FMLA leave any time from September 2023 through December 2023.[29]

108.    On December 11, 2023, Ms. Gersen sent a letter to Plaintiff informing her that the discrepancies in her reported time, which were being corrected on her time sheets by the Division of Human Resources, resulted in an overpayment of approximately $2,172.   This letter further stated that Plaintiff had 30 days to dispute the recovery and the amount being recovered.

109.    On December 21, 2023, Ms. Gersen received a letter from Plaintiff's union, CSEA, that disputed this recovery and stated that they would pursue all remedies to recoup any money that was garnished from Plaintiff's paycheck.

110.    Defendant OSC has not recovered any of this overpayment as of this date.

111.    On June 6, 2024, Dr. Lettrick noted that Plaintiff's "[d]epression is under good control on sertraline, will continue."

112.    Plaintiff did not request a reasonable accommodation or FMLA leave any time in

---

[29]    This asserted fact is deemed admitted for the reasons discussed in Note 3.   The Court adds that Plaintiff's response concedes that she "did not request FMLA for during [sic] the period [she] was being punished."   (Dkt. No. 34, Attach. 1, at ¶ 109.)

2024.[30]

113.    On July 31, 2024, August 14, 2024, and January 15, 2025, Ms. Gersen sent Plaintiff letters notifying her that her monitoring period, per the settlement and last chance agreement with Defendant OSC, would be extended based on her leaves of absence.

### Federal Funds Received by Defendant Office of the State Comptroller

114.    Any federal funds that Defendant OSC received in 2023, 2024, or 2025 were received on behalf of other New York State agencies and those funds were redistributed to those New York State agencies that received those funds for their own programmatic purposes.

115.    For the period between 2023 and 2025, Defendant OSC did not keep, receive, or make use of any federal funds or financial assistance for any program of the OSC.

### C.    Parties' Arguments on Defendants' Motion for Summary Judgment

#### 1.    Defendants' Memorandum of Law

Generally, in their motion, Defendants make three arguments.   (Dkt. No. 29, Attach. 1.) First, Defendants argue that Plaintiff's claim for declaratory and injunctive relief under the ADA should be dismissed because her requested accommodation of full-time telework was not a reasonable accommodation given that it (a) eliminated essential functions of her job including overseeing clerical staff, handling special projects, and assisting with training, and (b) prevented effective supervision over her work and attendance.   (*Id.* at 8-12.)   Moreover, Defendants argue, Plaintiff twice accepted a reasonable accommodation offered by Defendants after they engaged in an interactive process with her: the first time in July 2021, when she accepted the offered accommodation of moving her to a vacant cubicle distanced from other staff members,

---

[30]    This asserted fact is deemed admitted for the reasons discussed in Note 3.

with stackers for additional privacy, and did not express that the accommodation was insufficient; and the second time in 2023, when she accepted the offered accommodation of a 60% telecommute schedule (i.e., three days per week) and did not express that the accommodation was insufficient.   (*Id.* at 12-18.)    Further, Defendants argue that Plaintiff's request for injunctive relief is little more than a request for an order to "obey the law" that is not proper, and that Plaintiff in any event cannot seek injunctive relief here because she has not alleged any actual ongoing violation of federal law, but rather seeks to remedy a past violation. (*Id.* at 18-19.)

Second, Defendants argue that Plaintiff's claim for declaratory and injunctive relief pursuant to the Rehabilitation Act should also be dismissed for the following reasons: (a) Defendant OSC did not receive federal funds in the relevant year for any of its programs and activities (but merely redistributed federal funds to other agencies) and therefore its sovereign immunity has not been waived as to claims pursuant to the Rehabilitation Act; (b) in the alternative, her failure-to-accommodate claim is deficient for the same reasons that her ADA claim is deficient; and (c) also in the alternative, Plaintiff has failed to establish a prima facie case of retaliation, because (i) Defendants began their investigation into her time-and-attendance issues before they ever received notice that she had filed a NYSDHR complaint and she has failed to show a causal connection between Defendants' actions and that complaint, and (ii) Defendants have established a non-retaliatory reason for any adverse action taken against Plaintiff because they discovered that she had claimed to have worked overtime during a time when she could not have been working and had otherwise stolen or attempted to steal time, and Plaintiff cannot rebut this legitimate reason for the actions taken against her.   (*Id.* at 19-29.)

Third, Defendants argue that Plaintiff's NYSHRL claim should be dismissed for the

26

following reasons: (a) if Plaintiff's federal claims are being dismissed, the Court should decline to exercise supplemental jurisdiction over Plaintiff's NYSHRL claims; (b) this state law claim is barred by sovereign immunity against Defendant OSC and the other Defendants in their official capacities; (c) Defendant Gage and Defendant Mizener cannot be held liable under the NYSRL because they are not Plaintiff's employers; and (d) Plaintiff cannot establish a prima facie claim of retaliation for all the same reasons previously discussed related to the federal claims.  (*Id.* at 29-32.)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff makes two arguments.  (Dkt. No. 34.)   First, Plaintiff argues that she has raised genuine disputes of material fact regarding her claims for failure to accommodate and failure to engage in the interactive process, specifically as to whether the accommodation she requested was reasonable and what the essential functions of her job are.  (*Id.* at 6-11.)   More specifically, Plaintiff argues that attendance is not a per se essential function of her position and she has provided evidence in the form of her own declaration to show that her essential tasks were all computer based, and she offered to attend any necessary in-person meetings regardless of her accommodations.   (*Id.*) Further, Plaintiff argues that whether the 60% telework schedule Defendants offered was reasonable and whether Plaintiff can be said to have accepted that offer as a permanent solution (rather than a temporary measure while the process remained ongoing) are questions for a jury to resolve.  (*Id.*)   Relatedly, Plaintiff argues that Defendants failed to engage in a good-faith interactive process because they did not consider other alternatives, they did not meaningfully explain the rationale underlying the accommodation they ultimately offered her, and management later admitted that full-time telework would not pose a problem.  (*Id.*)

27

Second, Plaintiff argues that an issue of fact precludes summary judgment on her retaliation claim because Defendants' actions occurred close in time after when she filed her NYSDHR complaint (*Id.* at 11-12.)

### 3.    Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiff's opposition, Defendants make four arguments.    (Dkt. No. 35.)    First, Defendants argue that Plaintiff should be deemed to have admitted any disputed facts for which she has failed to cite contrary admissible evidence, and that the Court should disregard Plaintiff's newly submitted declaration to the extent it contradicts her previous deposition testimony.    (*Id.* at 6-7.)

Second, Defendants argue as to Plaintiff's ADA claim that (a) Plaintiff's acknowledgment that she would need to be in the office in person for certain meetings or tasks is an admission that an accommodation for 100% telework would conflict with the essential functions of her job and would impose an undue hardship by preventing Defendants from effectively supervising Plaintiff, (b) Plaintiff's arguments that Defendants failed to engage in the interactive process are contradicted by evidence showing that Defendants offered her a reasonable accommodation, which she accepted (regardless of whether it was her preferred accommodation), and she did not notify Defendants after that acceptance that the accommodation was inadequate or that the process needed to continue, and (c) Plaintiffs have not responded to Defendants' arguments that they are not currently failing to engage in the interactive process and thus her demand for declaratory and injunctive relief is improper    (*Id.* at 7-11.)

Third, Defendants argue as to Plaintiff's Rehabilitation Act claim that (a) Plaintiff has not challenged Defendants' argument regarding sovereign immunity and has admitted that

28

Defendant OSC was not the recipient of federal funds for the relevant years, (b) Plaintiff's request for declaratory and injunctive relief are deficient and abandoned for the same reasons as those related to her ADA claim, (c) Plaintiff has not offered any evidence regarding a causal connection that would sustain a prima facie case of retaliation, and (d) contrary to Plaintiff's assertion, there is no issue of fact regarding Defendants' motive for the actions they took against Plaintiff, which are all supported by evidence.   (*Id.* at 12-14.)

Fourth, Defendants argue as to Plaintiff's NYSHRL claim that (a) contrary to her opposition memorandum of law, she cannot assert a claim for failure to accommodate here because such a claim was dismissed as being without probable cause by the NYSDHR related to her NYSDHR complaint, and she has not asserted any disability discrimination claim in the Amended Complaint, but rather only a retaliation claim, (b) contrary to her argument, Plaintiff's request for reasonable accommodation is not a protected activity under the NYSHRL, (c) Plaintiff has not opposed Defendants' arguments regarding her NYSHRL retaliation claim, and (d) the evidence shows that Plaintiff cannot establish a prima facie case of retaliation and she has failed to offer any evidence to rebut Defendants' evidence showing a non-retaliatory motive. (*Id.* at 6, 14-15.)

## II.    LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."   *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[31]    As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v.*

---

[31]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

*Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.);

N.D.N.Y. L.R. 7.1(b)(3).   What the non-movant's failure to respond to the motion does is

lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set

forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

statement.[32]

Similarly, in this District, where a non-movant has willfully failed to respond to a

movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed

to have "consented" to the legal arguments contained in that memorandum of law under Local

Rule 7.1(a)(3).[33]   Stated another way, when a non-movant fails to oppose a legal argument

asserted by a movant, the movant may succeed on the argument by showing that the argument

possess facial merit, which has appropriately been characterized as a "modest" burden.   *See*

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested

---

[32]   Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[33]   *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

therein . . . .”); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

### A.    Whether Plaintiff's Claims Pursuant to the Rehabilitation Act Must Be Dismissed on Procedural Grounds

After careful consideration, the Court answers this question in the affirmative for the reasons discussed in Defendants' memoranda of law.   *See, supra,* Part I.C.1 and 3 of this Decision and Order.   To those reasons, the Court adds the following analysis.

"The Eleventh Amendment of the United States Constitution provides that '[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State,'" which has been interpreted to also include suits by citizens against their own states.   *T.W. v. New York State Bd. of Law Examiners*, 996 F.3d 87, 92 (2d Cir. 2021) (quoting U.S. Const. amend. XI; *Bd. of Trs. Of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 [2001]).   This immunity, however, is "not absolute."   *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 108 (2d Cir. 2001).   Section 504 of the Rehabilitation Act by its terms requires that "a state agree to waive its sovereign immunity from suit in federal court" "as a condition of accepting" federal funds. *T.W.*, 996 F.3d at 92 (quoting *Garcia*, 280 F.3d at 113).[34]   Crucial to this analysis is whether the program or activity in question actually *received* federal funds; if it did not, then there is no

___

[34]    *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability…shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.")

waiver of immunity.   *T.W.*, 996 F.3d at 92-93.

The Second Circuit has specified that "[t]here are thus three ways by which a State entity may waive its immunity to suit under Section 504": (1) "the entity may *directly* request and receive federal financial assistance that is conditioned on Section 504 coverage"; (2) "the entity may be a 'program or activity' of a 'department, agency, special purpose district, or other instrumentality of a State or of a local government,' 'any part of which' received federal aid"; or (3) "the entity may *indirectly* receive federal financial assistance through *another* entity that requests and receives the Federal financial assistance in the first instance and then *extends* that money to the non-requesting entity."   *T.W.*, 996 F.3d at 93 (emphasis in original).

None of the three above situations apply here.   In her declaration, Melissa Clayton, who currently serves as the Director of the Bureau of State Accounting Operations, states that (a) "[a]s the chief financial officer for the State, the New York State Comptroller is responsible for receiving federal funds on behalf of other New York State agencies that receive these funds for their programmatic purposes"; (b) "[a]ny federal funds that OSC received in 2023, 2024, or 2025 was [sic] received on behalf of other New York State agencies, and these funds were re-distributed to the New York State agencies that received those funds for their own programmatic purpose"; and (c) "[f]or the period 2023-2025, OSC did not keep or receive or make use of any federal funds or financial assistance for any OSC programs."   (Dkt. No. 29, Attach. 20, at ¶¶ 4-6.)   Plaintiff notably does not dispute that Defendant OSC does not itself use any of the federal funds it receives on behalf of other New York State agencies.

The situation presented here is in fact highly similar to those found by the Second Circuit in *T.W.* to be inconsistent with a waiver of immunity.   The Second Circuit was persuaded in that case by a decision rendered by the Eighth Circuit in which it was found that the Arkansas State

33

Treasurer's acceptance of federal funds on behalf of other agencies did not constitute a waiver of immunity because the State Treasurer neither accepted the funds for itself nor used the funds, but rather only held the funds for other agencies that had accepted those funds. *T.W.*, 996 F.3d at 96. Likewise, the Second Circuit found in its own case that the Chief Administrator of the New York State Unified Court System was "simply doing what he is bound to by state law" in accepting funds on behalf of other requesting entities, and that he merely held and redistributed those funds to the relevant agencies and did not use them himself. *Id.* at 96-97. Accepting and holding funds to be distributed to other agencies is essentially what the undisputed facts show Defendant OSC did here.

Plaintiff notably provides no response to Defendants' argument that her claims pursuant to the Rehabilitation Act are barred by sovereign immunity, and thus Defendants' argument need only have facial merit to succeed.[35] Because Plaintiff has also admitted that Defendant OSC did not itself retain or use any of the federal funds that it received on behalf of and disbursed to other New York State agencies, Defendants have met their burden here, and Plaintiff's Rehabilitation Act claims against Defendant OSC must therefore be dismissed.

To the extent that this sovereign immunity analysis does not apply to the Rehabilitation

---

[35]    In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

Act claims as they are asserted against Defendant DiNapoli in his official capacity as New York

State Comptroller against whom Plaintiff has sought only declaratory and injunctive relief, the

*Ex parte Young* exception to sovereign immunity applies only where the declaratory or

injunctive relief sought is prospective as opposed to retrospective.   *See T.W.*, 110 F.4th at 91-92

(noting that "'the Supreme Court has declined to extent the reasoning of *Ex parte Young* to

claims for retrospective relief'") (quoting *Ward v. Thomas*, 207 F.3d 114, 119 [2d Cir. 2000]).

Here, although Plaintiff attempts to frame her requested relief as preventing further and ongoing

violations, they essentially seek to remedy the past failure to accommodate and retaliation that

are the basis of her claims in that the remedy sought is to order Defendant DiNapoli to force

Defendant OSC to reopen the interactive process and grant her an accommodation for 100%

telecommuting.   (Dkt. No. 4, at ¶ 58.)   Given that Plaintiff's most recent request for

accommodation was in January 2023 and, as will be discussed below related to the merits of her

reasonable accommodation claims, it is undisputed that Defendants provided her with an

alternative accommodation in response to her request for accommodation, there is no basis in

either the Amended Complaint or the evidence to find that there is any ongoing violation

occurring; Plaintiff's assertions that her 2023 request is still outstanding because Defendants did

not grant her the specific accommodation she requested is simply not consistent with the law or

the facts.   As a result, Plaintiff's Rehabilitation Act claims against Defendant DiNapoli in his

official capacity must also be dismissed.

Moreover, to the extent that Plaintiff has attempted to assert Rehabilitation Act claims

against Defendant Mizener or Defendant Gage, such claims must necessarily be dismissed

because that statute does not provide for liability against individuals.   *See Goe v. Zucker*, 43

F.4th 19, 35 (2d Cir. 2022) (affirming dismissal of Rehabilitation Act claims against individual

defendants because "the Rehabilitation Act does not provide for individual liability") (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 [2d Cir. 2001]).

For all of these reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's Rehabilitation Act claims against all Defendants.

**B.     Whether Plaintiff's Reasonable Accommodation Claims Must Be Dismissed**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra*, Part I.C.1 and 3 of this Decision and Order.   To those reasons, the Court adds the following analysis.

As an initial matter, Plaintiff's ADA claim against Defendant DiNapoli (the only Defendant against whom it is asserted) must be dismissed on the same procedural grounds discussed above related to the Rehabilitation Act claims because she seeks the same retrospective relief to remedy the perceived violations caused by the denial of her 2023 request for reasonable accommodations: a reopening of the interactive process and granting her requested accommodation for 100% telecommuting.   Again, there is no evidence to substantiate any ongoing violation in this case such that the relief sought can only be considered to be retrospective.   Nevertheless, the Court will also assess the merits of Plaintiff's reasonable accommodations claim (an analysis which would apply equally to her similar Rehabilitation Act claim) as an alternative ground for granting Defendants' motion for summary judgment.

"'The ADA envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.'"   *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 98 (2d Cir. 2015) (quoting *Jackson v. N.Y.S. Dept. of*

*Labor*, 205 F.3d 562, 566 [2d Cir. 2000]).[36]  "The point of engaging in an interactive process is to 'discover[] a means by which an employee's disability could have been accommodated.'" *Noll*, 787 F.3d at 98 (quoting *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 101 [2d Cir. 2009]).  However, "the ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable."  *Noll*, 787 F.3d at 98.  Although the question of whether an employer's offered accommodation is reasonable is generally highly fact-specific and therefore more suitable for resolution by a factfinder, in cases where "the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'"  *Noll*, 787 F.3d at 98 (citing *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 [2d Cir. 1996]); *see also Durick v. New York City Dept. of Educ.*, 202 F. Supp. 3d 277, 292 (E.D.N.Y. 2016) (noting that "[i]n cases where a plaintiff claims she was offered or given an unreasonable alternative accommodation, the court looks to the alternative accommodation to determine whether it was plainly reasonable" rather than the more typical standard of needing to show that the specific accommodation she requested was reasonable).  "In other words, the plain reasonableness of the existing accommodation ends the analysis[;] [t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been

---

[36]    "An employer engages in an interactive process by, for example, 'meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome.'"  *Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 n.3 (2d Cir. 2017) (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218-19 [2d Cir. 2001]).

reasonable." *Noll*, 787 F.3d at 98 (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400-02 [2002]; *Borkowski v. Valley Centr. Sch. Dist.*, 63 F.3d 131, 137-38 [2d Cir. 1995]).

As an initial matter, the Court notes that this not a case in which Defendants denied a request for reasonable accommodation altogether, but rather one in which they provided a *different* accommodation than the one requested by Plaintiff.[37]   As the case law shows, the question is therefore not whether Plaintiff's request for full-time telecommuting was reasonable (and whether Defendants would experience any hardship by granting that request), but whether the *alternative* accommodation that Defendants offered (and Plaintiff accepted) was plainly reasonable.

Plaintiff appears to attempt to evade the fact that this standard (rather than the typical burden-shifting standard) should be applied to her claim by asserting that, because she never withdrew her request for full-time telecommuting, her acceptance of the offered accommodation was "explicitly temporary and not a concession that 60% [telecommuting] met her medical needs," and therefore not an "acceptance" at all.   (Dkt. No. 34, at 8-9.)   But regardless of whether she believed the offered accommodation failed to adequately meet her medical needs

---

[37]   Although Plaintiff appears to suggest in her deposition that her request for accommodation that she submitted in July 2021 was denied (Dkt. No. 29, Attach. 4, at 133), her own Amended Complaint alleges that "[i]n July 2021, plaintiff submitted a request for reasonable accommodations, allowing her to work from home four days per week.   The accommodation was granted and Plaintiff worked under this accommodation for approximately one year."   (Dkt. No. 4, at ¶ 15.)   Because Plaintiff's own allegations outline the scope of her claims, her inconsistent assertions in her deposition or any other form cannot provide a basis for now asserting any claim premised on a denial of her 2021 request.   Moreover, as was already discussed above in Part I.B of this Decision and Order, Plaintiff admitted in response to Defendants' Statement of Material Facts that Defendants granted an alternative accommodation related to this request, namely moving her to a cubicle farther away from other staff members and placing stackers for additional separate of privacy for cubicles in the area where Plaintiff's was located.

and told Defendants that she "didn't agree with the sixty percent," (Dkt. No. 29, Attach. 4, at 147), it is undisputed that Plaintiff nevertheless *agreed* to accept that accommodation, and that she worked pursuant to that accommodation until she was placed on administrative leave in April 2023, after which time she did not request to renew that accommodation or submit any new request for accommodation.    Moreover, there is no admissible record evidence to support any finding that Plaintiff informed Defendants that she viewed the 60% accommodation as a merely temporary solution or that she wanted to continue to engage in the interactive process despite accepting the offered accommodation, and, rather than continuing to attempt to pursue that process, she instead filed a NYSDHR complaint soon after the accommodation was made effective.    Based on the current record, Plaintiff's assertions that her January 2023 request for accommodations had not been resolved are both contrary to the undisputed facts and insufficient to suggest that the "plainly reasonable" standard should not be applied here.    Defendants offered an alternative accommodation and Plaintiff accepted it; those are the key facts that matter.    That she is seemingly not currently covered by an accommodation is not a reason to assess her claim under the more typical burden-shifting analytical framework because, as already noted, the undisputed evidence shows that Defendants granted her request for an accommodation (though not the specific one she requested) and there is no evidence or even allegation that she has filed a more recent request for accommodation that Defendants have either denied or failed to appropriately address.    As a result, the proper assessment here is whether the accommodation offered by Defendant and accepted by Plaintiff was plainly reasonable.

In this case, there were two requests for accommodations made by Plaintiff, both of which sought some degree of ability to telecommute: the request in July 2021 requesting to telecommute four days per week as needed, and the request in January 2023 requesting full-time

telecommuting as needed.   Plaintiff's Amended Complaint does not appear to challenge the response to the June 2021 request, given that her allegations primarily pertain to the circumstances of and response to the January 2023 request.   (Dkt. No. 4, at ¶¶ 15-23.)   Indeed, Plaintiff could not properly challenge the result of the June 2021 request because "a plaintiff must file a complaint with the Equal Employment Opportunity Commission ("EEOC") or NYSDHR within 300 days of the alleged discriminatory or retaliatory conduct," such that "[d]iscrete adverse events that occurred more than 300 days before that complaint are time-barred and cannot constitute a basis for a plaintiff's claim of discrimination or retaliation." *Collings v. State Univ. of New York at Cortland*, 24-CV-0534, 2025 WL 904649, at *8 (N.D.N.Y. Mar. 25, 2025) (Suddaby, J.) (citing *King v. Aramark Servs. Inc.*, 96 F.4th 546, 559 [2d Cir. 2024]; *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78-79 [2d Cir. 2015]). The determination on the June 2021 reasonable accommodation request was rendered on September 2, 2021, a date that is more than 300 days from when she filed the NYSDHR complaint on February 16, 2023.   (Dkt. No. 4, at ¶ 26; Dkt. No. 29, Attach. 11, at 1.)   As a result, the only action at issue here is as to Defendants' granting of the alternative accommodation for 60% telecommuting in response to the January 2023 request for accommodations.

Specifically, as outlined in the Statement of Undisputed Material Fact in Part I.B of this Decision and Order, that accommodation permitted Plaintiff to work from home Mondays, Wednesdays, and Fridays, and work in the office on Tuesdays and Thursdays.   The undisputed facts show that the accommodation was structured in this manner in order to ensure that Plaintiff did not have to work two days in the office in a row, given that she had previously indicated to Defendants that coming into the office on back-to-back days was a particular hardship for her

related to her anxiety.

It is well established that the fact that a defendant declines to grant a plaintiff the specific accommodation requested does not render the accommodation that it did grant unreasonable. *See Noll*, 787 F.3d at 95 (noting that "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee").   Rather, "[a]ll that is required is effectiveness," i.e., providing the plaintiff with ability to perform the essential functions of his or her job.   *Id.*

Plaintiff has not provided any evidence that she was unable to adequately perform the essential functions of her job pursuant to the provided accommodation.   Indeed, in her deposition, she testified that she has been one of the most productive employees in her unit even during times when she did not have accommodations to telecommute more than allowed by Defendants' standard policy.   (*See* Dkt. No. 29, Attach. 4, at 104-05 [noting that, at the time of her deposition, her work performance was "excellent" and testifying that "I have been and currently am the highest producer in the unit"], 109 [describing her performance in 2024, 2023, and 2022 as "excellent" and that her evaluations every year indicated that she was a "high producer"].)   Specifically, there is no evidence showing that Plaintiff was either unable to perform or complete her work on the days when she was in the office or that her level of productivity was significantly affected by her medical conditions when working the office two non-consecutive days per week such that it made her ineffective at her job.   Moreover, when asked at her deposition whether, within the handful of days between when the accommodation became effective and when she filed her NYSDHR complaint, she experienced any panic attacks, whether those occurred while she was at the office or telecommuting, or whether her anxiety or panic attacks worsened during that time period, Plaintiff was not able to provide any

41

concrete answers, stating rather that she "can't say" or "can't recall." (Dkt. No. 29, Attach. 5, at 9.) Plaintiff did testify that the number of panic attacks she experienced, both while at the office and while telecommuting, remained approximately the same in January and February 2023. (Dkt. No. 29, Attach. 5, at 10-11 [testifying that she had two or three panic attacks at the office in January and "probably the same" in February, but also that she experienced three or four while telecommuting in January and "the same" in February].) There is therefore no evidence to suggest that a greater number of days telecommuting actually reduced Plaintiff's panic attacks, no evidence that Plaintiff was unable to work in the office on Tuesdays and Thursdays because of her symptoms, and no evidence to suggest that those continued symptoms prevented Plaintiff from performing her essential job duties or affected her overall work performance.

Plaintiff additionally testified that, rather than waiting to see if the 60% accommodation would help her anxiety and panic attacks, she filed the NYSDHR complaint because "I read all the information on reasonable accommodations and what I got out of it was if your employer doesn't have a hardship to give it to you, then ideally, they should give it to you." (Dkt. No. 29, Attach. 5, at 14.) But again, the fact that Defendants did not give Plaintiff the specific accommodation she requested does not make the alternative accommodation unreasonable, and based on the fact that Plaintiff's incidence of panic attacks (which notably also occurred on days when she telecommuted) was not decreased even when she was permitted additional days of telework, there is nothing to suggest that Defendants' offered (and accepted) accommodation was unreasonable or that offering her full-time telework was the only reasonable solution to accommodate her disability. Again, the question here is not whether Plaintiff's request for full-time telework was or was not reasonable, but rather whether the 60% telecommuting schedule that Defendants provided as an accommodation was plainly reasonable in that it permitted her to

perform the essential functions of her job.   Under the undisputed facts and evidence presented here, the Court finds that it was.[38]

Plaintiff also asserts that Defendants failed to engage in the interactive process related to her requests for reasonable accommodations.   Even setting aside the Second Circuit's pronouncement that there is no liability against an employer for a failure to engage in an interactive process to explore other potential accommodations where the accommodation it has offered is plainly reasonable (as the Court had found the 60% telecommute accommodation offered here to be), the undisputed facts outlined previously in Part I.B of this Decision and Order contradict Plaintiff's assertion.   Specifically, the following relevant undisputed (or not properly disputed) facts show that Defendants did indeed engage in the interactive process: (1) in July 2021, Plaintiff submitted a request for reasonable accommodation seeking permission to telecommute four days per week as needed because of her general anxiety disorder and panic attacks; (2) after receiving supporting documentation from Plaintiff's physician, Defendants offered Plaintiff an alternative accommodation in September 2021 consisting of moving her to a vacant cubicle distanced from other staff members along with the addition of "stackers" between the cubicles in Plaintiff's area to provide greater privacy, as well as permitting Plaintiff to

---

[38]   The Court notably rejects Defendants' argument that working in person at the office was an essential function of Plaintiff's job, because that argument is not supported by any record evidence.   Specifically, the fact that proffered job descriptions show that an ERSE 2 functions as a "technical supervisor" to ERSE 1s does not in any way lead to a reasonable conclusion that such limited oversight requires performance of that supervision specifically in person.   Such supervisory responsibilities are characterized in the evidence as "review[ing] calculations and work completed by staff and ensure compliance with all relevant policies, rules, regulations, and laws" and "review[ing] and approv[ing] the work of staff performing a specific activity, but not their overall work behavior and assignments."   (Dkt. No. 29, Attach. 65, at 11, 15.)   Nothing in these definitions precludes the fact that supervision might be possible remotely and Defendant has provided no evidence to indicate that it was Defendant's specific practice that such supervision always be performed in person.

request approval from her supervisor to telecommute up to four days per pay period consistent with the agency's telecommuting policy, an offer which Plaintiff accepted; (3) nearly a year and a half later, in January 2023, Plaintiff submitted the relevant request for reasonable accommodation seeking "flexibility to work from home full time as needed"; (4) within a week after when this request was received, Defendants faxed additional questions to Plaintiff's physician related to her relevant medical conditions and later followed up regarding those questions when the physician's office did not provide answers; (5) on February 1, 2023, after receiving the information from Plaintiff's physician, Defendant Mizener (as Plaintiff's supervisor) and others discussed affording Plaintiff with a 60% telecommuting schedule where she would work in the office every other day so that she would not need to be in the office two days in a row; (6) when that proposal was presented to Plaintiff on February 3, 2023, she verbally agreed to accept it; (7) that accommodation was memorialized in a reasonable accommodation memorandum on February 7, 2023, and was approved to continue through May 10, 2023, after which it would be reviewed again; (8) Plaintiff immediately began working this accommodation schedule; and (9) on February 16, 2023, Plaintiff filed a disability discrimination complaint with the NYSHDR.

These undisputed facts substantiate a finding that, both times Plaintiff requested a reasonable accommodation related to her anxiety disorder and panic attacks, Defendants engaged in an interactive process that involved collecting evidence from Plaintiff's physician and, particularly related to the 2023 accommodation, discussing the proposed 60% telecommute option with Plaintiff before it was formally adopted, and provided an accommodation that Plaintiff herself accepted.   Plaintiff argues that, because Defendants did not explain why her original request for full-time telework was unreasonable or the basis for its proposed alternative

44

of 60% telecommuting, they failed to engage in the interactive process.   (Dkt. No. 4, at ¶ 21.) This argument ignores the undisputed fact, supported by the admissible record evidence, that Defendants met with Plaintiff before that proposed accommodation was adopted and asked her about the feasibility of that proposed accommodation,[39] and that Plaintiff herself stated that such an accommodation could work for her and she verbally accepted that offered accommodation without apparently voicing any concerns or requesting an explanation as to why Defendants had chosen that particular accommodation.

For all of the above reasons, Defendants' motion for summary judgment is granted as to Plaintiff's claims for failure to accommodate her disability.

**C.        Whether Plaintiff's Retaliation Claims Must Be Dismissed**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra*, Parts I.C.1 and 2 of this Decision and Order.   To those reasons, the Court adds the following analysis.

As an initial matter, the Court notes that, because Plaintiff's Rehabilitation Act claim (to the extent she has asserted a retaliation claim pursuant to that statute) has been dismissed on procedural grounds as discussed above, the only retaliation claim that remains is that brought pursuant to the NYSHRL.[40]   Defendant OSC and Defendant DiNapoli (to the extent he has been

---

[39]     Plaintiff notably testified at her deposition that this proposed accommodation was raised during a twenty-minute conversation she had with the Diversity Management Group.   (Dkt. No. 29, Attach. 4, at 145-46.)

[40]     The Court notes, however, that its analysis related to the merits of the NYSHRL provides an alternative ground for dismissing the Rehabilitation Act claim because a retaliation claim pursuant to the Rehabilitation Act is subject to the same or more demanding standard than the one applicable to a NYSHRL claim.

sued in his official capacity) are considered to be "arms of the state," and it is well established

that the "'NYSHRL does not include a waiver of the State's sovereign immunity to suit in

federal court.'"   *See Shaw v. New York State Off. for People with Developmental Disabilities*,

25-CV-0066, 2026 WL 654168, at *10 (N.D.N.Y. Mar. 9, 2026) (Nardacci, J.) (noting that

"sovereign immunity extended to 'arms of the state,' such as OPDD, as well as to its officials

sued in their official capacities for money damages").   As a result, Plaintiff's NYSHRL

retaliation must be dismissed as a matter of law against Defendant OSC as well as against

Defendant DiNapoli to the extent Plaintiff seeks monetary damages.[41]

Defendants also argue that the claims against Defendant Gage and Defendant Mizener

must be dismissed because they cannot be considered Plaintiff's "employer" and the NYSHRL

imposes liability only on employers.   (Dkt. No. 29, Attach. 1, at 30-31.)   However, the

NYSHRL imposes liability not only on employers, but also on "an aider or abetter 'if they

personally participate in the conduct giving rise to a discrimination claim.'"   *Petrie v. Off. of*

*Mental Health Cent. New York Psychiatric Ctr.*, 22-CV-0123, 2026 WL 161198, at *19

(N.D.N.Y. Jan. 21, 2026) (Coombe, J.).   Because Defendants have not argued why aider or

abetter liability would be inappropriate against these Defendants, the Court will not conduct that

inquiry *sua sponte*, but rather will proceed to an analysis of the merits of Plaintiff's claim.[42]

---

[41]     Plaintiff does not appear to seek declaratory or injunctive relief related to her NYSHRL claim.   (Dkt. No. 4, at ¶¶ 59-62.)

[42]     The Court notes that there is a split in this Circuit regarding whether the fact that sovereign immunity bars a claim against a plaintiff's employer means that an individual cannot be held liable as an aider or abetter in light of the fact that "a coworker cannot aid and abet the employer if the employer itself cannot be held liable.'"   *Petrie*, 2026 WL 161198, at *19 (quoting *Peck v. Cnty. of Onondaga, New York*, 21-CV-0651, 2021 WL 3710546, at *14 [N.D.N.Y. Aug. 20, 2021]; citing *Dawkins v. State Univ. of New York at Cortland*, 23-CV-1163, 2024 WL 3377938, at *7 [N.D.N.Y. July 11, 2024] [Suddaby, J.]).   For the reasons discussed in

"'The elements of a retaliation claim . . . are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action.'"  *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Weizel v. Bd. of Edu. of City of New York*, 287 F.3d 138, 148 [2d Cir. 2002]).   This standard generally applies to claims brought under both the Rehabilitation Act and the NYSHRL.   *See Dickson v. New York State Off. of Children and Family Servs.*, 453 F. Supp. 3d 587, 593 (E.D.N.Y. 2020) ("The Court analyzes retaliation under the Rehabilitation Act and NYSHRL together as the claims are analytically identical."); *Atherly v. New York City Dept. of Edu.*, 23-CV-0383, 2024 WL 1345741, at *11 (S.D.N.Y. Mar. 29, 2024) (noting that "[c]ourts analyze retaliation claims under Title VII, the ADA, Rehabilitation Act, NYSHRL and NYCHRL pursuant to the *McDonnell Douglas* framework").

There are two actions taken by Plaintiff in this case that could potentially be considered to be protected activities: her requests for reasonable accommodation, and her filing of a discrimination complaint with the NYSDHR.   As to the first activity, there is some disagreement in the decisions of federal courts as to whether a request for reasonable accommodations constitutes a protected activity for a NYSHRL retaliation claim, but, as a decision from the Southern District of New York recently recognized, New York's intermediate appellate courts have generally held that a request for a reasonable accommodation is not a protected activity. *Medina v. AAM 15 Mgmt. LLC*, 21-CV-7492, 2025 WL 2658615, at *2 (S.D.N.Y. Sept. 17, 2025)

---

*Dawkins*, the Court declines to find that the dismissal of claims against Defendant OSC on the basis of sovereign immunity should preclude any aider or abetter claim against Defendant Gage and Defendant Mizener.

(collecting cases).

Although Plaintiff does argue that requests for reasonable accommodations constitute protected activity, the cases she cites in support of that argument are not directly applicable here. *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (finding protected activity in a context where the plaintiff had complained to supervisors that he was being treated differently because of his seizure disorder (not because he requested reasonable accommodations for that disorder), a request for accommodation came only after the discrimination and retaliation had already been occurring for some time, and the court noted that the relevant protected activities as including "his alleged complaints to then-Sergeant Barry in November 1996, his ultimate filing of federal and state administrative charges in April 1997, and his efforts with the NYDHR to investigate his claims in February 1998"); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72-73 (2d Cir. 2019) (indicating that the relevant protected activity involved was filing a complaint with the NYSDHR and also noting as part of the discussion of the plaintiff's failure-to-accommodate claim that the plaintiff "never asked for an accommodation while employed as a Greeter or as an Assistant Cashier").   Because neither of the cases Plaintiff cites even suggest that a request for accommodation constitutes a protected activity and the current state of New York law suggests otherwise as to retaliation claims brought pursuant to the NYSHRL, the Court finds that Plaintiff's action of merely requesting reasonable accommodation does not constitute a protected activity for the purposes of her NYSHRL claim.   *See Kiley v. AIM Servs. Inc.*, 24-CV-0869, 2025 WL 128365, at *6 (N.D.N.Y. May 2, 2025) (D'Agostino, J.) (noting that "a request for a reasonable accommodation is not a protected activity under the NYSHRL").

Plaintiff's complaint to the NYSDHR is, however, undoubtedly a protected activity, and Defendants do not appear to argue otherwise.   The undisputed facts presented on this motion

48

establish that, although Plaintiff filed her discrimination complaint with the NYSDHR on February 16, 2023, Defendants did not seemingly become aware of that complaint until April 3, 2023, after the NYSDHR mailed a copy of that complaint to Defendant OSC on March 30, 2023. Thus, related to the second element of a retaliation cause of action, Defendants cannot be said to have had knowledge of Plaintiff's protected activity until April 3, 2023 (or, at the earliest, March 30, 2023).

The relevant actions taken against Plaintiff, as reflected by the undisputed facts discussed above, consist of (a) Defendant Mizener returning Plaintiff's timesheet on March 2, 2023, requesting that she remove overtime hours she represented working because those hours occurred during a time when the system was down, (b) Defendant Mizener informing Plaintiff on April 4, 2023, that she was not longer approved to work overtime and that there was reason to believe there were inaccuracies in her production reports and timesheets, (c) on April 26, 2023, after being interrogated, her being placed on administrative leave with pay, which was later changed to suspension without pay, (d) on June 5, 2023, her being interrogated again, (e) on June 16, 223, her receiving a Notice of Discipline with a Statement of Charges with the proposed discipline of termination, but the parties later entering into an agreement permitting Plaintiff to retain her position subject to an eight-week unpaid suspension, probation terms, and a prohibition on overtime and telecommuting, and (f) in December 2023, Defendant OSC also providing notice of intent to garnish her wages to recover the amount of salary attributable to her stolen time, but her union disputing that measure and Defendants did not attempt to collect that amount.

For the purposes of the third element, suspension without pay and the other terms of the eventual settlement agreement certainly can be reasonably said to constitute adverse employment actions sufficient to sustain a claim of retaliation. *See Lee v. Saul*, 19-CV-6553, 20-CV-2956,

2022 WL 1051216, at \*10 (S.D.N.Y. Feb. 10, 2022) (finding that suspension without pay could constitute an adverse employment action for the purposes of a retaliation claim); *accord Bermudez v. Bon Secours Charity Health Sys., Inc.*, 19-CV-7836, 2020 WL 104992, at \*4 (S.D.N.Y. Jan. 9, 2020); *see also Lambert v. Trump Int'l Hotel and Tower*, 304 F. Supp. 3d 405, 419 (S.D.N.Y. 2018) (noting that "[w]hile 'a deprivation of the opportunity to earn overtime hours can be considered a materially adverse employment action,'" there must be some "'material detriment as a result of being denied overtime, such as opportunities for career advancement'") (quoting *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217 [E.D.N.Y. 2014]; *Henry v. N.Y.C. Health & Hosp. Corp.*, 18, F. Supp. 3d 396, 406 [S.D.N.Y. 2014]); *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 433 (N.D.N.Y. 2009) (Hurd, J.) (noting that "the loss of an opportunity for a higher salary" as a result of a denial of overtime can constitute a material detriment).

As to the fourth element, although Plaintiff is correct that the withdrawal of approval to work overtime and the interrogations and investigation that led to her being suspended and then subject to the Last Chance Agreement all occurred in fairly close proximity to when she filed her NYSDHR complaint, it is notably undisputed that Defendant Mizener and others began having suspicions about Plaintiff's timekeeping practices in mid-to-late February of 2023 due to an instance in which she worked more than 20 hours of overtime and another in which she claimed to have worked during a time when the system was down, and that, after being instructed to review Plaintiff's timesheets, Defendant Mizener indicated by March 27, 2023, that there were discrepancies between Plaintiff's production logs and time worked.   A few days later on April 4, 2023, Defendant Mizener withdrew Plaintiff's permission to work overtime and a formal investigation into the perceived discrepancies was conducted from April through June 2023, ultimately leading to the conclusion that Plaintiff had stolen time and to the disciplinary measures

imposed.    As can be seen from this timeline, although the actions taken against Plaintiff occurred after Defendant received notice of her NYSDHR complaint, the suspicions and early fact-gathering efforts that led to those actions existed *before* such notice was received.    However, because no action was taken until *after* notice was received (and was in fact taken almost immediately after the date Defendant OSC received the mailed NYSDHR complaint, resulting first in the revocation of Plaintiff's overtime privileges and then her suspension without pay only about two months later), there is at the very least a genuine issue of material fact given that a reasonable jury could conclude that Plaintiff's NYSDHR complaint influenced Defendants' choice to suspend her overtime privileges and launch a formal and extensive investigation into her timekeeping practices, which ultimately led to disciplinary sanctions.[43]

However, even if Plaintiff has shown that there is at least a genuine question as to whether she can establish a prima facie case of retaliation, Defendants have provided detailed evidence showing a non-retaliatory reason for the actions they took against Plaintiff: multiple and repeated discrepancies between her production logs and timesheets that suggested Plaintiff did not actually perform any work during some of the hours for which she claimed (and received) compensation. (*See generally* Dkt. Nos. 29, Attachs. 31-36.)    *See also Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013) (noting that, once a plaintiff establishes a prima facie case of retaliation, the

---

[43]    The Court notes also that, because the Second Circuit has indicated that retaliation claims pursuant to the NYSHRL are subject to a more liberal pleading standard (*see, supra,* Note 36 of this Decision and Order), in order to state a prima facie case of retaliation under that standard, a plaintiff need only "demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (quoting *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 [2d Cir. 2024]). For reasons discussed in the four-part analysis already conducted, specifically related to the protected activity and adverse action elements, Plaintiff has met this more liberal standard.

burden shifts to the defendant "to demonstrate that there were legitimate, non-retaliatory reasons" for the adverse actions taken).   Defendants have proffered a legitimate reason for the actions taken against Plaintiff in the form of the evidence of time theft, and therefore the burden shifts to Plaintiff to show that this reason is, in fact, a pretext for retaliation.   *See Summa*, 708 F.3d at 129 ("Because legitimate non-retaliatory reasons can be offered for each of the adverse actions complained of, the burden shifts back to [plaintiff] 'to establish, through either direct or circumstantial evidence, that the [defendant's] action was, in fact, motivated by discrimination.'") (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 [2d Cir. 2001]).

Plaintiff has not met that burden here.   It is still a somewhat unanswered question in this Circuit as to whether amendments to the NYSHRL in 2019 were intended to bring the assessment of claims pursuant to that statute in line with the more lenient standard that is applicable to claims brought under the New York City Human Rights Law, such that, rather than requiring a plaintiff to show that retaliation was the but-for cause of the adverse employment actions (as is standard when assessing retaliation claims based on federal statutes), a plaintiff must show only that "a defendant's legitimate reason for termination was pretextual or motivated at least in part by an impermissible motive."[44]   *Ebadi v. Diamond Standard Inc.*, 24-CV-0103, 2026 WL 591569, at

---

[44]    The Second Circuit has affirmatively recognized that the 2019 amendments to the NYSHRL mean that NYSHRL claims are subject to the more liberal pleading standard present applied to claims pursuant to the NYCHRL related to the establishment of a prima facie case of retaliation, but the court did not have reason to proceed to the pretext stage of the plaintiff's claim in that case because it found that the defendants had not shown legitimate nonretaliatory reasons for its actions.   *Edelman*, 141 F.4th at 45.   The Second Circuit has indicated, in a nonprecedential summary order, that" [t]he post-amendment NYSHRL standard for causation is lower than Section 1981's 'but-for' standard: it requires only that the retaliatory conduct was undertaken 'at least in part' because of 'retaliatory motives.'"   *Flanagan v. Girl Scouts of Suffolk Cnty., Inc.*, 2025 WL 1501751, at *5 (2d Cir. May 27, 2025) (quoting *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 [2d Cir. 2015]).

*12 (S.D.N.Y. Mar. 3, 2026) (quoting *Livingston v. City of New York*, 563 F. Supp. 201, 246 [S.D.N.Y. 2021]); *Anderson v. Amazon.com, Inc.*, 23-CV-8347, 2025 WL 2780921, at *12 (S.D.N.Y. Sept. 30, 2025); *Kekovic v. Titan Motor Gr. LLC*, 22-CV-2142, 2025 WL 2173651, at *14 (E.D.N.Y. July 31, 2025).   In any event, even under the more lenient standard, temporal proximity alone is insufficient to show causation or pretext at this stage.   *Ebadi*, 2026 WL 591569, at *12 (collecting cases).

As a result, regardless of which standard applies here to Plaintiff's NYSHRL retaliation claim, the evidence does not create a genuine dispute of material fact as to whether the reasons offered by Defendants were pretextual or that Defendants were motivated at least in part by a desire to retaliate against Plaintiff.   Indeed, there is little in the evidence presented here to suggest retaliation other than the temporal proximity between when she filed her NYSDHR complaint and when Defendants rescinded her approval to work overtime hours, suspended her without pay, conducted their investigation, and ultimately provided her with the last chance agreement as an alternative to termination of her employment.

As indicated above in Part I.B of this Decision and Order, in 2023, Defendants' Labor Relations department conducted investigations of eight other employees in the Retirement Services unit where Plaintiff was employed, four of which were related to time and attendance issues, three of which were related to submission of a false instrument, and one of which was related to insubordination.   In one case from 2023, a Retirement Services employee who was found to have falsified overtime was subjected to interrogation, resulting in that employee promptly resigning.   In the prior year, a Retirement Services employee who was found to have falsified production reports related to work performed was disciplined by having their telecommuting privileges revoked and was subjected to investigation and interrogation, resulting

53

in that employee resigning rather than facing suspension and discipline.   This undisputed evidence therefore shows that Defendants addressed violations of time recording policies similarly to how they did related to the assessed misconduct by Plaintiff.

In response to Defendants' assertion of a legitimate non-retaliatory reason for their actions, Plaintiff offers little in the way of legal argument, asserting only, in a wholly conclusory manner, that "[w]hether these actions were retaliatory gives rise to factual disputes about motive and pretext, especially in light of the close temporal sequence and the assertedly selective nature of the investigation."   (Dkt. No. 34, at 12.)   But merely asserting that factual issues exist without pointing to any evidence in support of that assertion is insufficient to meet Plaintiff's burden, and, as already noted, temporal proximity alone is insufficient to show a retaliatory motive beyond a prima facie case.   The undisputed evidence that other employees were investigated for similar conduct contradicts Plaintiff's bare assertion that the investigation against her was selective, and the fact that those other employees chose to resign rather than face discipline does not change the fact that Defendants conducted investigations against them just as they did when made aware of discrepancies in Plaintiff's timekeeping.   Nor could Plaintiff's explanations regarding what she was doing during identified times when she was not logging work specifically into Defendants' case system or when there were gaps in her production reports permit a reasonable factfinder to conclude that Defendants' actions against her were motivated in part by retaliation.   Defendants have provided a lengthy report detailing exactly where the discrepancies existed and their reasons for finding that Plaintiff had falsely claimed to have worked during times when she was not actually completing any work.   It is not the role of the Court or the jury to second-guess Defendants' internal personnel decisions where Plaintiff has failed to adduce any evidence beyond her own belief that Defendants' failure to accept her explanations was motivated by a

retaliatory intent as opposed to mere disbelief of or disagreement with her proffered explanations. Where, as here, Plaintiff's theory of causation appears to be based almost entirely on the fact of temporal proximity, she cannot overcome Defendants' provision of a legitimate non-retaliatory reason for the actions taken against her.

For the above reasons, the Court grants summary judgment to Defendants on Plaintiff's retaliation claims.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 29) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 4) is **DISMISSED**; and it is further

**ORDERED** that the Clerk of Court is directed to issue a Judgment for Defendants and close this action.

Dated: May 27, 2026
　　　　Syracuse, New York

Glenn T. Suddaby
U.S. District Judge